UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | CASE NO. 04-15680 |
| GWENDOLYN B. ADAMS | SECTION B |
|     Debtor | CHAPTER 7 |
| **JOANN MARY A. DiCRISPINO, as** **Independent Administratrix of the** **Succession of Dalton Hurston Adams**     Plaintiff | **ADVERSARY NO. 04-1208** |
| Versus | |
| **GWENDOLYN B. ADAMS**     **Defendant** | |

## MEMORANDUM OPINION

This matter came before the court on June 20, 2005 as a trial on the complaint of Joann Mary A. DiCrispino ("DiCrispino"), as independent administratrix of the succession of Dalton Hurston Adams, the deceased husband of the debtor, objecting under 11 U.S.C. §523(a)(2), (4) and (6) to the discharge of a debt owed to the succession and seeking damages in the amount of $9,111.45 for losses sustained by the succession. For the reasons expressed, the court will dismiss the complaint of Ms. DiCrispino and discharge the debtor from the claim of the succession.

### I. Background Facts.

The debtor and Dalton Hurston Adams began living together in 1999. They

-1-

were married in April, 2003. Both the debtor and Mr. Adams had grown children from prior marriages. Mr. Adams' family included JoAnn Mary A. DiCrispino, who was adopted and raised by Mr. Adams, and Melissa L. Wesch and Richard J. Shepherd, the foster children of Mr. Adams. Mr. Adams was not healthy – he suffered from diabetes, blockage of the carotid artery and had a heart bypass operation.

Mr. Adams died on June 25, 2004, and Ms. DiCrispino was appointed the independent administratrix for his succession. His last will provided that all of his assets were to be inherited by DiCrispino, Wesch and Shepherd. As it developed, the succession lacked funds to distribute the bequests to legatees under Mr. Adams' will, and the succession is left with unpaid creditors.

Prior to the last few months of his life, living in the property in Slidell, Louisiana, known as the camp became not as desirable for Mr. Adams because 1) his getting up and down the stairs was difficult, 2) his medical expenses were increasing, 3) the camp mortgage payments had to be made; and 4) the debtor's son had a mobile home where debtor and Mr. Adams could live without making any mortgage or rent payments. On March 19, 2004, three months prior to his death, Mr. Adams sold the camp for $80,000, netting nearly $18,000.00. Mr. Adams had maintained a checking account at Bank One for many years. On March 26, 2004, just days after the sale of the camp, the debtor was added as a joint signatory to the Bank One account, and

funds from the sale of the camp were deposited into the Bank One account at or near the same time.

The parties have stipulated that on June 18, 2004, the Bank One account contained a balance of $14,837.59. It is also uncontested that immediately prior to Mr. Adams' death, the debtor used money in the account to pay certain of her debts, including $3,342.53 to J.C. Penney, $1,236.22 to Hibernia National Bank and $300.00 to cash. On June 23, 2004, the debtor had $9,700 from the account converted to a cashier's check payable to herself. Of this amount, $5,467.30 was deposited into the debtor's Hibernia Bank account, and the rest was again placed in a cashier's check payable to debtor.

On July 12, 2004, the debtor was served with a state court temporary restraining order, prohibiting her from disposing of funds in the Hibernia account that would reduce the balance to less than $9,000.[1] Three days later, on July 15, 2004, the debtor closed the Hibernia account.

A timeline of the relevant transactions follows:

| | |
|---|---|
| April, 2003 | Debtor and Mr. Adams marry |
| March 19, 2004 | Camp sold, $18,144.88 net received from sale. |
| March 26, 2004 | Debtor added as signatory to Bank One account |
| June 18, 2004 | Check of $4,342.52 to J.C. Penney from Bank One; |

---

[1] The debtor testified that she had already paid the $9,000 plus out prior to service of the TRO on her on July 12, 2004. The exhibits are inconclusive as to whether this is correct.

|  |  |
|---|---|
|  | Bank One account has a balance of $14,827.59 |
| June 23, 2004 | Payments from Bank One account:<br>– $1,236.22 to Hibernia<br>– $300 cash<br>-- $9,700 cashiers check to debtor |
| June 25, 2004 | Mr. Adams dies |
| June 28, 2004 | $5,467.30 deposited into Hibernia account<br>$5,467.30 paid to funeral home from Hibernia account<br>$4,232.70 cashier's check to debtor |
| July 8, 2004 | Debtor pays $2,750 for septic system for son's mobile home where debtor and Mr. Adams had lived until his death |
| July 12, 2004 | Temporary restraining order served on debtor |
| July 15, 2004 | Hibernia account closed |

The plaintiff contends that this timeline clearly shows that the debtor unlawfully took and used money properly belonging to the succession to pay her debts and that dischargeability of those sums should be denied under any one of the following provisions of the Bankruptcy Code.[2]

## II.  Applicable Law.

1. Section 523(a)(4).

Section 523(a)(4) excepts from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny".  The first portion of §523(a)(4) is "fraud or defalcation while acting in a fiduciary capacity".  The concept

---

[2]  11 U.S.C. §101 et seq.

of fiduciary under §523(a)(4) is narrowly defined, and applies only to technical or express trusts, not those which the law implies from the contract.³ Plaintiff has not provided any argument that the debtor occupied a fiduciary relationship sufficient to meet the requirements of §523(a)(4), and the court finds that a fiduciary relationship under the section is not present.

Discharge may also be denied under §523(a)(4) if the debtor committed embezzlement or larceny. Unlike debts arising out of fraud or defalcation, those arising out of embezzlement or larceny need not involve a fiduciary.⁴ Embezzlement and larceny are determined for bankruptcy purposes under federal common law, and are defined as follows:

> Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come. It differs from larceny in the fact that the original taking of the property was lawful, or with the consent of the owner, while in larceny the felonious intent must have existed at the time of the taking".⁵

In order to establish a claim of embezzlement under §523(a)(4), the plaintiff must show that: (1) the debtor appropriated the funds for his or her own benefit; and

---

³ *In re Bennett*, 989 F.2d 779, 784 (5th Cir. 1993), *citing In re Angelle*, 610 F.2d 1335 (5th Cir. 1980).

⁴ *In re Hartman*, 254 B.R. 669, 674 (Bankr. E.D. Pa. 2000).

⁵ *In re Imbody*, 104 B.R. 830, 840 (Bankr. N.D. Ohio 1989); 4 *Collier on Bankruptcy* ¶ 523.10, at 523-76 (15th Ed. Rev. 2000).

(2) the debtor did so with fraudulent intent or deceit. [6]

Larceny is defined as the "fraudulent and wrongful taking and carrying away of the property of another with intent to convert it to the taker's use and with intent to permanently deprive the owner of such property."  The element of fraudulent intent is essential to both larceny and embezzlement.[7]

Plaintiff asserts that embezzlement is present because debtor secretly appropriated funds in the Bank One checking account and used them for her own benefit. Plaintiff argues that while Mr. Adams was still alive, but on his deathbed, the debtor used funds from the joint checking account to pay off her J.C. Penney and Hibernia bills, and that this constitutes a misappropriation sufficient to deny dischargeability under §523(a)(4).

The testimony at trial was that Mr. Adams, before his death, had authorized the debtor to "pay bills." Whether that was "his", "hers", "theirs" or "all" bills is far from clear.  Plaintiff asserts that her adoptive father wanted only his separate bills paid, and not the bills of Ms. Adams.  The debtor asserts that she was told to "pay the debts". Other equally contradictory testimony was heard on the issue.[8]  Therefore, this court

---

[6] *In re Hartman*, 254 B.R. 669, 674 (Bankr. E.D. Pa. 2000).

[7] *In re Hartman*, 254 B.R. at 674.

[8] Melissa Wesch, a foster daughter of Mr. Adams, testified that her father, Mr. Adams, called her in between 12 - 1:00 in the afternoon, June 23, 2004 and told her he had $14,000 in

cannot hold that the plaintiff has met her burden of proving fraudulent intent in use of the funds by the debtor. The court finds credible the debtor's testimony that she believed the money in the joint checking account was community property, which she could use, and that she was authorized by Mr. Adams to use, to pay bills. This is exactly what she did.

The plaintiff asserts that the funds in the Bank One account were the separate property of Mr. Adams because they were generated by the profit received from the sale of the camp, which she believed was Mr. Adams separate property because he had used the proceeds from the sale of a house he owned with his first wife on Duel Street in New Orleans to buy the camp. She reasons that embezzlement or larceny occurred because the deceased's separate property was used to pay either community debts or the separate debts of the debtor. On the other hand, the debtor argues that the camp was owned by Mr. Adams and his foster child[9], Mr. Shepherd, and that Mr. Shepherd made

---

the bank, wanted his bills paid and that she and her sister (the plaintiff) should have the balance, but if they wanted they could share it with Gwin (the debtor). Another witness, Marion G. LeBlanc, who had introduced the debtor to Mr. Adams, was at this same bedside vigil with Ms. Wesch but her memory and testimony were to the contrary. Ms. LeBlanc stated Mr. Adams said he wanted the bills and the funeral expenses paid and "the rest should go to Gwin."

Thus, the court cannot resolve with any certainty what Mr. Adams' wishes were with reference to paying the bills or use of the money in the joint checking account that was subject to draw only by him or the debtor.

[9] Neither the deed of acquisition nor the deed of sale for the camp was offered into evidence. A settlement statement, dated March 19, 2004, was admitted in evidence as Exhibit 29, but for the most part it shows only Mr. Adams as the seller. Evidently, Mr. Shepherd and the other adopted or foster children of Mr. Adams felt that some of the sums received from the sale

a donation of his share of the funds from the sale and that Mr. Adams by depositing the funds into the joint checking account had donated part of them to her. Because part of the funds was a donation, she reasons that the funds constituted community property which could be used to pay her bills.

Mr. Shepherd did not testify at trial, and his view of the character of the funds – whether Mr. Shepherd intended to donate his share to Mr. Adams or to Mr. Adams and the debtor – in the joint Bank One account is not known. As previously mentioned, the only documentary evidence received at the trial was the settlement statement.[10] It lists Dalton Adams as a seller in all respects except that it provides in an addendum on page 4 that Richard J. Shepherd is an additional seller. Neither the actual settlement checks, nor the deposits into the account, are in evidence. Because the addendum to the settlement statement reflects Mr. Shepherd is an additional seller,[11] it cannot be said that the entirety of the proceeds of the sale of the camp constitute the separate property

---

of the camp belonged to them, because it had been purchased with sums realized from the sale of the house on Duel Street in New Orleans where Mr. Adams and their mother had lived. They were evidently willing for Mr. Adams to take and use all of the $18,000 – probably because they did not know at the time that Mr. Adams had put it in a joint account subject to draw by the debtor.

[10] Exhibit 29.

[11] This addendum simply adds to the confusion because the purpose of it is to certify that the settlement agent has been furnished with the correct taxpayer identification number of the additional seller. Although it contains Mr. Shepherd's name and address as an additional seller, it has no taxpayer number for him and is signed only by Mr. Adams.

Mr. Adams. Thus, the plaintiff has failed to demonstrate that the funds in the Bank One checking account were the separate property of Mr. Adams.

Even if none of the funds in the joint account legally belonged to debtor, the types of bills paid by the debtor do not indicate fraudulent intent existed on her part. The J.C. Penney bill paid by the debtor included charges for items that benefitted the community, such as items for the marital home. Of the $9700 that was converted to a cashier's check, Ms. Adams paid: $550 for funeral flowers; $5,467.30 to the funeral home; $50 tor the preacher; $2750 for a septic tank at her son's mobile home; and the remainder for court costs and attorney fees. Payment of funeral expenses from succession assets was proper and does not constitute larceny or embezzlement. Even the payment by the debtor for the septic system for her son's trailer does not appear sufficiently egregious to rise to the level of larceny or embezzlement, especially because prior to his death the debtor and Mr. Adams resided at the mobile home for a period of time rent free.[12]   As such, this court holds that the plaintiff has failed in her burden to show fraudulent intent necessary to prove embezzlement or larceny under §523(a)(4).

---

[12] The plaintiff admitted on cross examination that, though her father had lived with the debtor in the mobile home since March 2004, both she and her father knew that the bathroom facilities did not work and her uncle was supposed to see about fixing it but denied that Mr. Adams ever told the debtor to fix it or authorized the debtor to pay for fixing it.

2. Section 523(a)(2)(A).

Section 523(a)(2)(A) exempts from discharge a debt:

"for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
    (A) false pretenses, a false representation, or actual fraud, ..."

Generally, debts falling within §523(a)(2)(A) are debts obtained by frauds "involving moral turpitude or intentional wrong, and any misrepresentations must be knowingly and fraudulently made."[13] To succeed under § 523(a)(2)(A), the objecting party must prove that: (1) the debtor made representations; (2) at the time they were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) the creditor relied on the representations; and (5) that the creditor sustained losses as a proximate result of the representations.[14]

Fraud can be based on any type of conduct calculated to convey a misleading impression, thus, it is not relevant whether the representation is express or implied.[15] A finding of fraud does not require an affirmative statement and may be predicated on

---

[13] *In re Martin*, 963 F.2d 809, 813 (5th Cir. 1992), *citing In re Foreman*, 906 F.2d 123,127 (5th Cir. 1990).

[14] *In re Bercier*, 934 F.2d 689, 692 (5th Cir. 1991); *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995).

[15] *In re Wyant*, 236 B.R. 684, 695 (Bankr. D. Minn. 1999).

a failure to disclose a material fact.[16] Bankruptcy courts have overwhelmingly held that a debtor's silence regarding a material fact can constitute a false representation actionable under §523(a)(2)(A).[17] A false representation is an express misrepresentation, while a false pretense is an implied misrepresentation of conduct which is intended to create a false impression.[18]

Plaintiff asserts that Ms. Adams made a false representation by concealing the fact that she was spending the money in the joint checking account, or by failing to correct the plaintiff's mistaken belief that the money from the sale of the camp remained intact in the Bank One checking account. The court finds that insufficient evidence exists of intent to deceive for the succession's claim to be made nondischargeable under §523(a)(2)(A). Debtor is the step mother of the plaintiff, having married Mr. Adams only fourteen months prior to his death. Relations between the debtor and Ms. DiCrispino were not good, and there was little communication between the two. It is not surprising that the debtor did not inform Ms. DiCrispino when writing checks. This lack of communication does not rise to the level of fraud or misrepresentation.

Also, for the reasons already expressed, plaintiff has failed to prove that a loss

---

[16] *In re Docteroff*, 133 F.3d 210, 216 (3rd Cir. 1997).

[17] *Id.*; *In re Wyant*, 236 B.R. at 695.

[18] *In re Grant*, 237 B.R. 97 (Bankr. E.D. Va. 1999).

occurred either to the succession or to its legatees.[19] Plaintiff has failed to prove that all of the funds in the account were the separate property of Mr. Adams. Instead, it appears that a portion of the funds constituted community funds, which the debtor could use to pay both her separate and the community debts. Ms. Adams paid claims from a joint checking account, on which she was an authorized signatory. Additionally insufficient proof exists that the deceased wanted only his separate bills paid from funds in the Bank One account. Instead, credible evidence exists that the deceased wished for all of the couple's bills to be paid, and authorized the debtor to pay the bills after giving her signatory power on the account over three months before he died, which allowed her control over funds in the account. For the foregoing reasons, the court will dismiss the §523(a)(2)(A) complaint.

3. Section 523(a)(6).

Section 523(a)(6) denies the discharge of debts that arise out of "willful and malicious injury by the debtor to another entity or to the property of another entity."[20] The Supreme Court has stated that the term "willful" in §523(a)(6) modifies injury and

---

[19] The parties stipulated that approximately $14,000 remained in the Adams' joint checking account at the time of his death, although there is some dispute as to whether all or only some of the funds were the separate property of Mr. Adams. Mr. Adams funeral bills included: $550 for funeral flowers, $5,467.30 to the funeral home, and $50 for the preacher. Ms. DiCrispino also asserts that Mr. Adams had bills due of $2,300 to Wells Fargo and $1900 to Household Financial.

[20] 11 USC 523(a)(6).

therefore "requires deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."[21] The Fifth Circuit has interpreted the term "willful and malicious injury" as a unitary concept that entails a two-pronged test.[22] An "injury is 'willful and malicious' where there is either an objective substantial certainty of harm or a subjective motive to cause harm."[23] Debts arising from recklessly or negligently inflicted injuries do not fall within §523(a)(6).[24]

There is no evidence that the debtor acted with a subjective motive to cause harm. The evidence shows that funds were placed in the couple's joint checking account, the deceased's last wish was for the debtor to pay bills and that she actually paid funeral expenses and other bills. It cannot be said that the debtor possessed the subjective motive to harm either the succession or Mr. Adams' legatees.

To satisfy the objective test, plaintiff must demonstrate that by failing to pay the succession's debts or by paying debts other than the separate debts of Mr. Adams, the debtor was aware that particularized harm would occur to the succession or the legatees of Mr. Adams. Insufficient evidence has been received that all of the funds in the joint

---

[21] *Kawaauhau v Geiger,* 523 US 57, 61 (1998).

[22] *In re Miller*, 156 F.3d 598 (5th Cir. 1998).

[23] *Id.* at 606.

[24] *Kawaahau v. Geiger*, 118 S.Ct. 974, 978 (1998).

-13-

checking account constituted the separate property of Mr. Adams, or that Mr. Adams wanted only his separate bills paid, or that the debtor acted in a manner not agreed to or requested by Mr. Adams. In short, insufficient evidence exists that the debtor's actions were objectively substantially certain to cause harm to the succession. Therefore, plaintiff's claim will not be exempted from discharge under §523(a)(6).

For the foregoing reasons, a judgment will be entered dismissing plaintiff's complaint.

New Orleans, Louisiana, this 25th day of August 2005.

*J. A. Brown*
_____
JERRY A. BROWN
CHIEF BANKRUPTCY JUDGE